## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ARTHUR YOCHIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-01656-TWP-DML |
| | ) | |
| MICHAEL GARGANO, | ) | |
| INDIANA FAMILY AND SOCIAL | ) | |
| SERVICES ADMINISTRATION, | ) | |
| DOUGLAS ELWELL, | ) | |
| DIVISION OF DISABILITY AND | ) | |
| REHABILITATIVE SERVICES, | ) | |
| NANCY ZEMAITIS, | ) | |
| BUREAU OF REHABILITATION | ) | |
| SERVICES/VOCATIONAL | ) | |
| REHABILITATION SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiff Arthur Yochim's ("Mr. Yochim")
Motion for Preliminary Injunction. Mr. Yochim, a 59 year old Indiana citizen, has been blind
since birth due to a condition called retinopathy. Since moving to Indiana in 2007, Mr. Yochim
has been a client of the Indiana Family and Social Services Administration ("FSSA"), the
Division of Disability and Rehabilitative Services ("DDRS"), and the Bureau of Rehabilitation
Services/Vocational Rehabilitation Services ("VRS"). These entities, and their directors or
secretaries, are the Defendants in this matter (collectively, "Defendants"). After growing
dissatisfied with the quality and quantity of the vocational services he was receiving in Indiana,
Mr. Yochim requested that the DDRS send him to an out-of-state service provider – specifically,
the Colorado Center for the Blind. On December 16, 2011, after the DDRS denied this request
and an impartial hearing officer affirmed that decision, Mr. Yochim brought a lawsuit in this

Court under Title I of the Rehabilitation Act.  On February 6, 2012, Mr. Yochim filed the present Motion for Preliminary Injunction.  The Court presided over oral arguments on the motion on March 8, 2012.

To be sure, the Court is less than thrilled with the services provided by Defendants to date.  That said, the remedy Mr. Yochim seeks — requiring Defendants to send Mr. Yochim to the Colorado Center for the Blind — is truly extraordinary, if not unprecedented.  Indeed, neither Mr. Yochim's counsel nor the Court was able to locate a single Title I case where a federal court reversed a hearing officer's decision and ordered a state agency to send a plaintiff to a different vocational facility, let alone an out-of-state facility.  Applying the relevant law, the Court simply cannot find that a preliminary injunction is warranted.  Plaintiff's motion (Dkt. 26), while brought for understandable reasons, is **DENIED**.

## I.  <u>FACTUAL BACKGROUND</u>

Mr. Yochim grew up in Miami, Florida.  His father encouraged him to be independent, whereas his mother performed many daily tasks for him.  Although undoubtedly done out of love, her insistence on helping Mr. Yochim, to some degree, hampered his independence.  That said, it is worth emphasizing that Mr. Yochim, on his own, has achieved remarkable accomplishments throughout his life.  In 1971, Mr. Yochim graduated from public high school; in 1973, he graduated from Miami Dade Junior College with an Associates Degree; and in 1976, he graduated from the University of South Florida with a BA degree in political science.  While at South Florida, Mr. Yochim lived in the dorms, ate meals in the cafeteria, provided for his own daily needs and desires, and successfully completed his classes.  After earning his BA, Mr. Yochim lived with his mother in Miami, Florida, where he worked for 28 years in the private sector handling telephone sales accounts for a company that sold cleaning supplies.  His

responsibilities included maintaining and servicing existing accounts and taking orders over the telephone.  To commute to work, Mr. Yochim used the bus and paratransit.  As Mr. Yochim testified at the administrative hearing, he has "never let blindness stop [him] from accomplishing life's goals."  Mr. Yochim currently receives SSDI and Medicare.

In early 2007, due to his mother's declining health, Mr. Yochim and his mother moved to Plainfield, Indiana and took up residence with Mr. Yochim's sister and her husband.  Soon thereafter, Mr. Yochim sought out vocational training from DDRS, which was able to immediately certify him as eligible to receive vocational rehabilitation since he received SSDI.  Specifically, DDRS referred Mr. Yochim to Bosma Enterprises for the Blind ("Bosma") for orientation, mobility, and home skills training.  Initially, Melanie Wells served as Mr. Yochim's vocational rehabilitation counselor at DDRS, but she then took a job with Bosma.  Subsequently, Loretta Kipasa ("Ms. Kipasa") served as Mr. Yochim's vocational rehabilitation counselor until retiring in December 2010.  Ms. Kipasa had considerable experience working with the blind and visually impaired.

Around August 16, 2007, Ms. Kipasa met with Mr. Yochim, who chose a vocational goal of "telephone work," but only in or around Plainfield, Indiana.  Ms. Kipasa suggested that Sycamore Services ("Sycamore"), located in Plainfield, Indiana, would be convenient as a service provider for his job preparation.  Mr. Yochim agreed to use Sycamore.  According to David Heard ("Mr. Heard"), the supervisor at DDRS, "Sycamore...would provide the job skills, Bosma would provide the at-home skills that he would need."  Notably, Sycamore had never previously dealt with a blind client; instead, they had largely worked with the hearing impaired, individuals with cerebral palsy, and the mentally challenged.  Ms. Kipasa did not inform Mr. Yochim that he would be Sycamore's first blind client.

3

On September 27, 2007, Bosma issued a "Teaching Plan" concluding that Mr. Yochim "lacks the skills and equipment to perform daily living skills independently." On October 15, 2007, Sycamore, after evaluating Mr. Yochim, created a Plan for Employment and Supports ("PES").  The PES is then used to make an Individualized Plan for Employment ("IPE").  The PES stated that Mr. Yochim is totally blind, has a Bachelors degree, receives Medicare and SSDI, has over 25 years experience in telephone sales, and seeks a wage of $8.00 per hour for 20 hours of work per week. The PES concluded:

> Arthur will need assistance filling out applications and practice interviewing for a job.  He will also need transportation using LINK Hendricks County services and on-site job coaching through first 90 days. Assistive technology to be determined.

On October 18, 2007, Ms. Kipasa noted in her Case Activity Report that she had met with Mr. Yochim to discuss his PES.  At this time, Mr. Yochim reported no problems with his services.  He further stated he wanted to do an independent job search in addition to the services he was receiving at Sycamore.  To that end, Mr. Yochim would need access to a computer.  The report noted that Mr. Yochim had a computer and is able to use a standard keyboard, but is unfamiliar with the command keys and numbers pad.  The report further noted that Mr. Yochim has requested computer training.  Therefore, Ms. Kipasa added a computer assessment and training to the IPE.

In October 2007, Mr. Yochim ratified his IPE, which provided an employment outcome of Sales Representative, telephone services.  The original IPE projected an achievement date of April 30, 2008.  However, during the 2008 annual IPE review, the completion date was extended to October 30, 2010.  Mr. Yochim continued some orientation and mobility classes at Bosma and worked with Sycamore in various learning activities, including job readiness skills, resume

4

preparation, job interview preparations, and potential employment appointments with churches and other entities in or around Plainfield, Indiana.

Throughout 2008, Kathryn Henry ("Ms. Henry") detailed Mr. Yochim's progress on the computer and how Mr. Yochim frequently called her with questions. Indeed, the case notes suggest that he was an "eager student."  On August 25, 2008, Ms. Kipasa noted that she had received Ms. Henry's final report on Mr. Yochim and that his goals had been accomplished. Ms. Kipasa further noted "[n]o additional training at this time unless it is job-specific, and then will evaluate situation." Unfortunately, similar progress was not being made at Sycamore. On September 11, 2008, Burt Eichen ("Mr. Eichen"), Mr. Yochim's employment counselor at Sycamore, wrote Ms. Kipasa the following:

> He is very impatient, but lives in an area that currently has no reliable transportation.  He also wants to work part time instead of full time.  I feel that he is capable of working full time and getting off benefits, but that is not his plan.… When I totaled my car a few months ago and was out with a broken shoulder, this was unacceptable to him.

Nonetheless, on October 29, 2008, Ms. Kipasa noted in her Case Activity Report that she, Mr. Yochim, and Mr. Eichen met "to update/review [Mr. Yochim's] IPE and to ensure that all needed services are included." At this time, Mr. Yochim concluded "that the IPE needed no revisions."  Ms. Kipasa also wrote:

> We discussed concerns ... in reference to Arthur's chosen job logistics.  He lives in Plainfield, would like to work in Plainfield; however he has been actively searching for a job since October, 2007.  We discussed his need to re-evaluate his job options and possibly consider looking for work within the Indianapolis city limits.  Knowing that this would pose a transportation issue, Arthur agreed to discuss the transportation issue with his family. We discussed his computer training with Kathy Henry and his training with Jill Thomas, IRT, Bosma Rehab. He has met all computer training goals.  He has a few things (frying on the stove top, cooking, and table techniques) to complete with the IRTR services.

At the hearing, Mr. Heard testified that:

5

> Case Notes show that Kipasa asked Yochim at least twice over the entire three years since entering his IPE whether he wanted to change his employment outcome goal or his services providers, and Yochim did not want to change. He appeared to be happy and satisfied. His training reports show that he was satisfied and happy with the services and what he was doing. Reports from Bosma were that his progress was very good regarding the instruction, he was positive, and they wanted to continue his training.

Notably, in November 2008, Mr. Yochim, in an effort to demonstrate his skill set, began volunteering at Bosma. He continued to do so for over 13 months. But despite applying to three separate positions with Bosma, Mr. Yochim was not offered a job due to a skills mismatch.

On May 23, 2010, Mr. Yochim's mother passed away. According to Mr. Yochim, "[t]his event had a major impact" on his life, and he did "not want to depend upon [his] sister and her family for the rest of [his] life." Following his mother's death, Mr. Yochim attended the National Federation of the Blind Convention by himself in Dallas, Texas. When asked on cross-examination whether Sycamore and Bosma were "okay" until his mother died, Mr. Yochim answered "[y]eah, pretty much." On July 20, 2010, Ms. Kipasa met with Mr. Yochim and noted as follows:

> I met with Arthur to discuss his case. Arthur began with a conversation about his late mother: passed away in May. I expressed my sympathy and encouraged him to continue with his psychotherapy as a means of intervention.
>
> We discussed job services, and he is still currently volunteering on Thursday's at Bosma Industries (answering the phone and Brailling manuals and other equipment). He enjoys this and mentioned that Bosma staff is pleased to have him there. He has not had much success with locating a job. He wanted to put the blame on Sycamore. However, I reminded ... Arthur that he could have asked to switch to a new provider when he and I had this same discussion back in February of this year. He has decided to discontinue services with Sycamore (Plainfield IN office). … He expressed interest in Bosma for job services. However, he has to decide which service (vision rehabilitation or job service) is a priority. VRS cannot provide dual services (at a single provider at the same time). He can move into job services (at Bosma) once the vision rehabilitation has ended or visa versa.

He discussed his need for additional Personal Adjustment training. However, he
is wanting to go to one of the rehabilitation centers in either Texas, Alabama, or
Louisiana. I told Arthur that this may not be approved, especially since Bosma
Industries offers a comparable Rehabilitation Training Program. He has no
reason to attend other than to brush up on his Independent Living Skills. He also
said that he is independent in his home and takes the Hendricks county Link for
transportation to appointments and to get to Bosma.

Along similar lines, Mr. Heard testified at the administrative hearing as follows:

When Yochim notified Kipasa in late 2010 that he wanted to change his IPE to
provide different service providers other than Bosma Enterprises and Sycamore
Services, he wanted an unidentified out of state provider. Kipasa told Yochim
that other service providers would give only the same services as he was
receiving; VR, therefore, would not approve this under VR policy. However, Ms.
Kipasa told Yochim to continue and research more details about places where he
might like to go and come back.

As Mr. Yochim's counsel has repeatedly emphasized, Defendants did not assist Mr.
Yochim in researching out-of-state facilities. Their view was that, when it came to investigating
out-of-state vocational facilities, Mr. Yochim was essentially on his own. On this point, Mr.
Heard testified at the administrative hearing that "[i]f a client is wanting to select a service
provider that is out of our network, and as such, using someone that would be out of state, they
are required to present any documentation they will have to kind of ... sway the decision in
choosing an out-of-state provider." Along similar lines, he testified that researching the
Colorado Center for the Blind was "left up to Mr. Yochim."

In December 2010, Ms. Kipasa retired and Mr. Heard became Mr. Yochim's vocational
counselor. Mr. Yochim made a request to receive out-of-state services in Colorado, but did not
provide documentation regarding the Colorado program. Mr. Heard denied this request because,
in his view, the available services were comparable and the Colorado facility was not cost-
effective compared to Bosma. As Mr. Heard put it, "[t]he Colorado Center for the Blind
provides the same services as Bosma … [t]here is really no difference in the two outside of the

living arrangement is someplace else." Further, Mr. Heard testified that "Mr. Yochim never presented any information about cost." At the administrative hearing, Mr. Heard testified that the Colorado program would cost roughly $12,000.00 more than Bosma.[1] But, as Mr. Yochim's expert has since indicated, Bosma's cost *per month* is actually higher, meaning the "Colorado Center for the Blind provides more bang for the buck."

Mr. Heard spoke with Mr. Yochim and entered the following in his February 9, 2011 Case Activity Report:

> Spoke with client today, his sister has kicked him out of their home after a physical altercation. He has been living at the Holiday Inn in Plainfield since January 31. Any written correspondence should go to his therapist: Dr. Sherri Rediger, First Baptist Church of Plainfield.

Mr. Yochim stayed at the Holiday Inn by himself for 19 days. On this point, Mr. Yochim testified that living in the hotel "gave me the experience of being able to be on my own" and that the hotel staff "just loved the way that I got around and did things." Mr. Yochim currently lives in an assisted living apartment, but according to his expert's report, "he plans to move from assisted living into independent housing."

As mentioned, the Court believes that the services provided to Mr. Yochim were perhaps less than optimal. While a client at Bosma, Mr. Yochim only received 19 hours of sporadically-held rehabilitation training, which (over the course of 14 months) amounts to roughly 80 total minutes of training per month.[2] Mr. Yochim also received roughly 31 hours of computer instruction over

---

[1] At oral arguments, Defendants' counsel suggested that the difference in price was closer to $20,000.00.

[2] At oral arguments, Defendants did not dispute this figure (to be candid, Defendants did not provide the Court with much insight at all during oral arguments). However, the Court would be remiss not to mention that the quantity of training received by Mr. Yochim is somewhat unclear. For instance, during the administrative hearing, Mr. Yochim testified that Brenda Jinks, an employee of Bosma who Mr. Yochim specifically requested, gave him one to one-and-a-half hours of mobility training twice a week for three months. If accurate, this would total anywhere from 25 to 38 hours of mobility training. He then testified that he received life skills training once per week for an hour to an hour-and-a-half. Assuming this occurred over a period of three months, which is somewhat unclear from the testimony, then this would amount to anywhere from 12 to 19 hours of total life skills training. Thus, according to

the course of six months.  But, according to Mr. Yochim, he still lacked necessary computer skills.  With respect to Sycamore, at one point, one of Mr. Yochim's employment counselors conceded that she did not know how to use computers and disliked using them—never a good thing for a person seeking a job in a developed economy in the twenty-first century.  Moreover, Mr. Yochim was never offered an interview, let alone a job.  Additional facts are added below as needed.

## II. **PROCEDURAL HISTORY**

On January 5, 2011, Mr. Yochim filed a request for an impartial due process hearing to review DDRS's denial of his request to receive services from the Colorado Center for the Blind. An administrative hearing was held before a hearing officer on March 8, 2011.  Just over two months later, on May 13, 2011, the hearing officer, Paul A. DePrez, issued a thorough and well-reasoned memorandum of findings and a decision denying Mr. Yochim's request.  From there, Mr. Yochim made a timely request for impartial administrative review, challenging the hearing officer's conclusion that Mr. Yochim did not require substantial amounts of additional training and that DDRS's denial of out-of-state services was not arbitrary or capricious.

By consent, Mr. Yochim submitted his materials for the impartial administrative review on September 26, 2011.  At this time, Mr. Yochim submitted an evaluation from Richard Davis, a Title I expert who works for the National Federation of the Blind, opining that the Colorado Center for the Blind could offer Mr. Yochim necessary services that Indiana lacks.  For instance, "the Colorado Center offers full immersion into total blindness skills and provides a critical philosophy seminar course to help students develop positive attitudes about their blindness— issues of great importance to Mr. Yochim." (Dkt. 1 at 6.)  On December 2, 2011, Mr. Yochim's

---

Mr. Yochim's own testimony, he received anywhere from 37 to 57 hours of training relating to mobility and life skills during a three month period.

counsel sent a letter to FSSA stating that "if no response [to the submission] is received by December 9, 2011, [we] will presume that DDRS has denied Mr. Yochim's request."  To date, no formal written decision has been issued during this layer of administrative review.  Moreover, Mr. Heard has informed Mr. Yochim that the lack of a formal response from FSSA was tantamount to a denial of his request.

On December 16, 2011, Mr. Yochim filed the present complaint, which contains allegations that: (1) Defendants violated 29 U.S.C. § 722(b)(2)(B) and 34 C.F.R. § 361.52 by failing to give Mr. Yochim an "informed choice" by neglecting their "affirmative obligation to provide him with information about potential vocational rehabilitation services and providers, especially out-of-state service providers." (Dkt. 1 at 7-8); and (2) Defendants violated 29 U.S.C. § 723(a) and 34 C.F.R. §§ 361.45(d)(2)(ii), (iii), (3), 361.50(b) by denying "his access to [an] out-of-state provider in favor of an in-state provider because the out-of-state provider was perceived to cost more." (Dkt. 1 at 8-10).

## III.  LEGAL STANDARD

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and internal quotations omitted).  When a court is presented with a request for preliminary injunction, it considers multiple factors.  As the Seventh Circuit has recognized, a party seeking to obtain a preliminary injunction must demonstrate: (1) "a likelihood of success on the merits," (2) "a lack of an adequate remedy at law," and (3) "a future irreparable harm if the injunction is not granted." *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1020-21 (7th Cir. 2002).  The court must then balance, on a sliding scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing

party. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc*., 549 F.3d 1079, 1086 (7th Cir. 2008).   The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Id*.  Finally, the court must consider the interest of and harm to non-parties that would result from the denial or granting of the injunction.   *Id*.  The decision to grant or deny a request for injunctive relief is not governed by a rigid, unbending formula.   As the Seventh Circuit has recognized, a court must "exercise its discretion to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id*. (citation and internal quotations omitted).

### IV. <u>DISCUSSION</u>

**A.      General Principles of Title I**

With this standard in mind, the Court turns to the relevant law. The Rehabilitation Act seeks to provide handicapped individuals with certain benefits and rights.  Specifically, "Title I" of the Rehabilitation Act, titled "Vocational Rehabilitation Services," is  intended to assist states in operating statewide "comprehensive, coordinated, effective, efficient, and accountable programs of vocational rehabilitation," each of which is "designed to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities, consistent with their strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, so that such individuals may prepare for and engage in gainful employment." 29 U.S.C. § 720(a)(2). To that end, Congress created an interactive federal-state model where a state may receive federal funding for its vocational rehabilitation programs if it submits to the Commissioner of the Rehabilitation Services Administration a plan which meets certain federal guidelines.  29 U.S.C. § 721(a)(1)(A).

Under Title I, the designated State "shall complete the assessment for determining eligibility and vocational rehabilitation needs, as appropriate, and shall provide the eligible individual or the individual's representative, in writing and in an appropriate mode of communication, with information on the individual's options for developing an individualized plan for employment…." 29 U.S.C. § 722(b)(1). Importantly, Defendants are obligated to develop and implement the IPE "in a manner that affords eligible individuals the opportunity to exercise <u>informed choice</u> in selecting an employment outcome, the specific vocational rehabilitation services to be provided under the plan, the entity that will provide the vocational rehabilitation services, and the methods used to procure the services…." 29 U.S.C. § 722(b)(2)(B) (emphasis added).  The IPE should be reviewed and "amended, as necessary…." 29 U.S.C. § 722(b)(2)(E)(ii).  Specifically, Title I's regulations specify that vocational rehabilitation agencies like the Defendants must, among other things, provide the client with, or assist the client in finding, "information necessary to make an informed choice about the specific vocational rehabilitation services, including the providers of those services, that are needed to achieve the individual's employment outcome."  34 C.F.R. § 361.52(c).

## B.      Reasonable Likelihood of Success

Preliminary injunctions are, by their very nature, extraordinary remedies.  But, in the Court's view, Mr. Yochim's request is truly extraordinary.  This is not a case where the plaintiff is asking the Court to merely keep the status quo intact.  Nor is this a case where, for instance, the Court is ordering an individual to be sent to an out-of-state facility in order to *enforce* the hearing officer's decision.  *See Mt. Vernon School Corp. v. A.M. ex rel. his parents*, 2011 WL 2020668 (S.D. Ind. May 24, 2011) (implementing new placement of student, pursuant to hearing officer's order).  Rather, this motion presents the opposite scenario, asking the Court to dissolve

a hearing officer's decision and grant a preliminary injunction requiring the state agency to send Mr. Yochim to an out-of-state facility.  Such an order would undo and completely supplant the agency's decision and the hearing officer's ruling.

Moreover, as mentioned, neither the Court nor the parties were able to locate a single Title I case where a district judge took such an action with respect to a different vocational facility, let alone an out-of-state facility.  Of course, the fact that such a ruling would be unprecedented does not, by itself, make it unfeasible.  Thus, a close review of Mr. Yochim's arguments is warranted.  The crux of his claim is that "Defendants are violating Title I of the Rehabilitation Act by denying Mr. Yochim his informed choice of an out-of-state Mr. Yochim his informed choice of an out-of-state vocational rehabilitation service provider, and withholding services that Mr. Yochim needs to achieve his employment and independent living goals." (Dkt. 27 at 7.)

At the outset, the Court would be remiss not to mention that it initially had concerns about whether Mr. Yochim has a viable right of action under either 29 U.S.C. §§ 722 or 723.  For instance, in *Mallett v. Wisconsin Div. of Vocational Rehabilitation*, 130 F.3d 1245 (7th Cir. 1997), the Seventh Circuit held that Title I of the Rehabilitation Act does not grant a private right of action to a handicapped individual seeking to challenge whether he has received an appropriate individualized written rehabilitation program.  Specifically, the Seventh Circuit ruled that the district court properly dismissed the plaintiff's § 722 claim because "Congress did not intend to imply a private right of action under § 722." *Id.* at 1251.  And, at first glance, Mr. Yochim's § 723 claim also appears to rest on similarly shaky ground.  At its core, this claim amounts to an attack on the adequacy of Indiana's vocational services available to the blind. Notably, in *Jackie S. v. Connelly*, 442 F. Supp. 2d 503 (S.D. Ohio 2006), the district court for the

13

Southern District of Ohio ruled that Congress did not intend for prospective plaintiffs to have an implied private cause of action to seek declaratory or injunctive relief for alleged systemic violations of Title I. *Id*. at 525.

But, upon closer review, the Court's fears were, to some degree, unfounded. Specifically, when asked about the import of these cases during oral arguments, Mr. Yochim's counsel directed the Court to § 722(c)(5)(J), which provides that "[a]ny party  aggrieved by a final decision … may bring a civil action for review of such decision.  The action may be brought in any State court of competent jurisdiction or <u>in a district court of the United States of competent jurisdiction</u> without regard to the amount in controversy." 29 U.S.C. § 722(c)(5)(J) (emphasis added).  Specifically, this provision was added by Congress in 1998; therefore, it post-dates the Seventh Circuit's otherwise binding decision in *Mallett*.  Based on this judicial review provision, it is clear that Congress intended to allow individuals like Mr. Yochim to use federal district courts to review final decisions made by state hearing officers or state reviewing officials.  *See Campbell v. Miller*, ___ F. Supp. 2d ___, 2011 WL 6086665, at *9 (S.D. Ohio Dec. 7, 2011) ("most courts who have addressed the issue have found that the Rehabilitation Act does not include an express or an implied cause of action <u>outside of an express right to judicial review of a rehabilitation services decision, which was added in 1998</u>.") (emphasis added; citations omitted).  Therefore, this Court will review Mr. Yochim's case as a *de facto* appeal of the hearing officer's decision.

This begs the question:  is the hearing officer's decision entitled to deference?  The limited case law available suggests that the decision is entitled to "substantial deference." Specifically, courts addressing this issue have ruled that "district courts should apply a modified *de novo* standard of review, engaging in an independent review of the administrative record

14

while according substantial deference to the policy views of the [relevant agency] … and the findings of state administrative proceedings." *Wasser v. New York State Office of Vocational & Educ. Services for Individuals with Disabilities*, 602 F.3d 476, 477 (2d Cir. 2010) (emphasis added; affirming district court's dismissal of action seeking review of hearing officer's decision denying claims for benefits and services under Title I). Thus, the Court must conduct an independent review of the administrative record, while still giving "due weight" to the administrative proceedings. *Id.* at 478.

This is the same standard of review that applies to appeals of hearing officer's decision under the Individuals with Disabilities Education Act ("IDEA")—a statute that is, in many ways, similar to Title I. *Id.* at 477. In the IDEA context, courts have noted that "[a]lthough the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence' … such review 'is by no means an invitation to the courts to substitute their own notions of sound … policy for those of the … authorities which they review.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191-92 (emphasis added; quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).  In other words, due deference is appropriate given that the judiciary generally "lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Rowley,* 458 U.S. at 206. The same reasoning applies with equal force in the context of Title I, given the federal courts' general lack of expertise dealing with vocational rehabilitation issues for disabled individuals.

Given the deference owed to the hearing officer's decision, coupled with the soundness of that decision, the Court simply cannot find that Mr. Yochim has a reasonable likelihood of succeeding on the merits of his claim.  In a thorough order, the hearing officer recognized that

"Yochim had twenty-eight years of experience going to work after navigating the obstacles of college life, junior college life, and those during high school, all in the every day life of large cities and all with success."  Further, the hearing officer recognized as follows:

> When Yochim arrived at VR in 2007 he was seeking employment, subsequently entered an IPE, and received some assistance from Job coaches at Sycamore.  He concluded that after resume prep and discussion of interviewing, these services were not assisting him sufficiently and desired a change in service providers. Yochim sought Bosma to provide these services, but this was not possible as long as Bosma provided the orientation and mobility.  Otherwise VR would have approved this change in service providers to Bosma. Perhaps now VR can approve this switch of service providers to Bosma.

> Although Brown emphasized that the selection of Sycamore was improper because previously it never had a blind person as a client, in and of itself, this fails to show that Yochim received inferior assistance.  Someone had to be the first blind client.

> Clearly, Yochim needs assistance by a good job coach who is in the proximate area Yochim seeks employment and is familiar with many potential employers and not a job coach who is out-of-state.… Yochim's lack of transportation complicates seeking employment outside of Hendricks County as does his desire to obtain employment only within Plainfield.  If he could expand his employment seeking area, he might have greater possibility of being successful.  Although all must recognize that the current unemployment situation makes it most difficult for many to find work.

> Attending a training Center in Colorado would not enhance Yochim's possibility of finding in Plainfield any employer who would offer him a job.  Finding the job opportunity is accomplished by the extensive, effective searching by both Yochim and his job coach. VR provided the computer software and services because Yochim sought these to allow him to seek employment on his own as well as relying on a service provider.

In the end, the hearing officer concluded that "Heard's refusal to authorize any further training at the Training Center in Colorado was reasonable and was not arbitrary or capricious. If Yochim continues to desire [services], it would be reasonable for VR to authorize Bosma to provide job placement services as Yochim has previously sought VR's approval of Bosma's providing such services."

Plainly stated, Mr. Yochim has not given the Court a convincing reason to reverse the hearing officer's decision. Mr. Yochim devotes considerable attention to arguing that Defendants denied him "his right of informed choice under Title I by withholding information about vocational rehabilitation services and providers." (Dkt. 27 at 13.) This argument stems from the fact that Defendants, particularly DDRS, did not assist Mr. Yochim with his research about out-of-state facilities that potentially offered more beneficial services. To the extent that Defendants should have offered more assistance, however, this issue is now a moot point. The fact is, Mr. Yochim completed his own research concerning facilities located throughout the United States, and then made a proposal asking DDRS to send him to a top-notch facility in Colorado. There is no allegation, for instance, that Mr. Yochim made a choice that was uninformed or based on incomplete information. Analogous cases have held that such after-the-fact claims that do not result in substantive harm are not viable under Title I. *See Diamond v. Michigan*, 431 F.3d 262, 267 (6th Cir. 2005) (any failure of state rehabilitation services agency to conduct annual review of client's IPE did not cause client substantive harm, so as to support relief under the Rehabilitation Act).

This position is further reinforced by two principles found in the regulations and case law. First, the regulations allow an agency to prefer in-state facilities over out-of-state facilities to keep down costs: "[t]he State unit may establish a preference for in-State services, provided that the preference does not effectively deny an individual a necessary service." 34 C.F.R. § 361.50(b)(1) (emphasis added); *see also Wasser v. New York State Office of Vocational and Educational Services for Individuals with Disabilities*, 683 F. Supp. 2d 201, 220 (E.D.N.Y. 2008) ("VESID's preference for public over private schooling is comparable to its preference for in-state over out-of-state services, which is expressly allowed under federal regulations in order

to keep down rehabilitation costs."). Second, clients of vocational rehabilitation agencies do not have *carte blanche* to choose their vocational facility. Title I does not give "a client the final or exclusive decision-making authority to determine his own goal." *Buchanan v. Ives*, 793 F. Supp. 361, 366 (D. Me. 1991) (denying plaintiff's request for a permanent injunction that would have required defendants to provide further rehabilitation assistance toward his goal of becoming a commercial photographer). In other words, "[a]lthough the client must be given every opportunity to participate in the decision-making, the rehabilitation counselor must make the final decision on eligibility and the scope of services provided." *Id*.

Here, Mr. Yochim was content with his level of services for nearly three years, until his mother passed away, which sparked a new outlook on life. He then completed his own independent research regarding various facilities located throughout the country. When he proposed being sent to Colorado, however, his counselor denied the request. In doing so, the counselor determined that such a request was neither necessary nor cost-effective. According to the regulations and applicable law, this determination was within the province of the counselor, and a hearing officer agreed. The Court is not persuaded that it has meaningful grounds to reverse this line of agency and administrative decision-making at the preliminary injunction stage.

Mr. Yochim's second argument boils down to the fact that the Colorado Center for the Blind offers better services than any facility in Indiana. Indeed, the services offered by the Colorado Center for the Blind are impressive, even including "confidence-boosting lessons" like "sky diving or whitewater rafting." Moreover, when Mr. Yochim was initially asked what made him pick Colorado, he responded, in part, that "one of my friends says Colorado's God's paradise on Earth…. I mean it's a beautiful state." He later added that the program would

"empower me to determine my own destiny" and "[w]ho knows, I mean I could even get a job in Colorado, for all I know.…  I mean this could be a whole new world that could open up to me." As his advocate stated during the administrative hearing, "it's not like he has a vendetta against the agency.  He just feels that his training for his life's work would be better served in the Colorado Center for the Blind."

That may be true.  However, *necessity* – not superiority – of services is the touchstone of Title I, *see* 29 U.S.C. § 723(a), and it appears well-settled that Title I does not require agencies to "maximize … employability … without regard to financial considerations." *Zingher v. Department of Aging & Disabilities*, 664 A.2d 256, 259-60 (Vt. 1995) (affirming agency's decision rejecting the petitioner's request for costly computer equipment; "[a]lthough the computer system requested may enhance petitioner's employability, petitioner has not shown that such a system is *necessary* for him to be employed") (emphasis in original); *see also Truss v. State, Dept. of Human Services*, 1999 WL 1072583, at *4 (Tenn. Ct. App. Nov. 30, 1999) (Congress "did not intend that such individuals are entitled to receive the best possible education…."). At oral arguments, counsel for Mr. Yochim repeatedly compared Title I to the IDEA.  But the IDEA is equally clear: "School districts are not required to do more than to provide a program reasonably calculated to be of educational benefit to a child; they are not required to educate the child to his or her highest potential." *Evanston Comm. Consolidated School Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004) (citation omitted; emphasis added).

The Court pauses to note that, since the hearing officer's decision, Mr. Yochim submitted an evaluation from Richard Davis, a Title I expert who works for the National Federation of the Blind, opining that the Colorado Center for the Blind could offer Mr. Yochim necessary services

that Indiana lacks.  The Court has reviewed this expert report in detail.  But, for at least two reasons, the Court finds that it is not a game-changer for purposes of this motion.  First, after Mr. Yochim submitted this report, Mr. Heard informed him that his request for services had been denied.  Therefore, it stands to reason that the agency received and considered in full this report, but still sided with the hearing officer's decision.

Second, the Court must again emphasize the procedural posture of the present motion. Mr. Yochim is asking the Court to reverse a hearing officer's decision and require Defendants to send him to a facility in Colorado, even though the relevant agency and an impartial arbiter have already determined that such services are not necessary.  The fact that Mr. Yochim subsequently submitted an expert report might, if possible, warrant something akin to a remand so that a hearing officer could reconsider his decision in light of the expert report.  But Mr. Yochim is not seeking that type of relief.  Instead, he is asking the Court to render a decision that will completely dissolve and replace the hearing officer's decision without any real opportunity for further judicial review.  In other words, if the Court were to grant this injunction and order the state agency to send Mr. Yochim to Colorado, then, despite the early posture of this case, Mr. Yochim would, once and for all, prevail and Defendants would lose (unless the remedy was stayed pending appeal).  This fact reinforces the Court's view that the remedy sought by Mr. Yochim is, under these unique factual circumstances, extraordinary.

The Court must make one final observation.  It appears that in the middle of 2010, Mr. Yochim decided to stop working with Defendants.  As the hearing officer observed, Mr. Yochim still has not yet received job assistance services from Bosma, even though such services are available and Bosma unquestionably has experience working with the blind and visually impaired.  Perhaps that will be a viable possibility going forward.  In the IDEA context, this

Court has previously observed that it does not always behoove plaintiffs to draw "a line in the sand" and "stop interacting with" the relevant agency. *See M.B. v. Hamilton Southeastern Schools*, 2010 WL 3168666, at *7-8 (S.D. Ind. Aug. 10, 2010), *affirmed* ___ F.3d ___, 2011 6644068 (7th Cir. Dec. 22, 2011). For all of the reasons, the Court finds that Mr. Yochim does not have a reasonable likelihood of succeeding on the merits of his claim.

## V. <u>CONCLUSION</u>

Mr. Yochim's life achievements, persistence, and desire to become employed are admirable and should be supported as is required by law. But, unfortunately, the Court finds that his legal arguments in the present context do not carry the day for the extraordinary remedy of injunctive relief. For the reasons set forth herein, Mr. Yochim's Motion for a Preliminary Injunction (Dkt. 26) is **DENIED**. Hopefully, in the wake of this ruling, the parties will be able to reach a mutually agreeable solution that allows Mr. Yochim to achieve his eminently reasonable goal of attaining employment and living the life of dignity that he so very much deserves.

SO ORDERED.   3/23/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Laura Lee Bowker
INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov, samantha.smith@atg.in.gov, laurabowker@hotmail.com

Gregory P. Care
BROWN, GOLDSTEIN & LEVY, LLP
gpc@browngold.com, es@browngold.com

Thomas E. Crishon
INDIANA PROTECTION & ADVOCACY SERVICES
tcrishon@ipas.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
jefferson.garn@atg.in.gov, emily.davis@atg.in.gov

Sharon Krevor-Weisbaum
BROWN, GOLDSTEIN & LEVY, LLP
skw@browngold.com, tt@browngold.com